WO

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Charlie Gahn, dba Olde Tymers Restaurant,<br><br>        Plaintiff,<br>v.<br><br>Columbia Casualty Insurance Company, et al.,<br><br>        Defendant. | CV 03-630 TUC DCB<br><br>**ORDER** |

This action was filed on November 28, 2003, in state court by the Plaintiff, who sought to compel arbitration of an insurance claim. The Defendant removed the case to this Court on December 24, 2003.

On August 19, 2004, the Court granted Plaintiff's motion to compel an appraisal of loss and to compel the Defendants to appoint an appraiser to conduct the appraisal. The Court denied Defendants' motion to dismiss and alternative motion for summary judgment, and stayed the case pending arbitration of the claim. On December 23, 2004, the Defendant filed a motion to vacate or modify the stay and a motion for summary judgment, arguing that the Plaintiff breached the policy's cooperation clause. On February 22, 2005, the Court denied the Defendants' motion, finding it to be a re-hash of arguments presented in opposition to the motion to compel the appraisal.

After more judicial involvement than should have been necessary, appraisers were named and an umpire was selected to arbitrate the appraisal. An appraisal hearing was set by the umpire for May 30, 2006, to determine the amount of the claimed insurance loss pursuant to the terms and conditions of the policy. On May 3, 2006, the parties notified the umpire that their appraisers had reached agreement on the amount of the loss, and the hearing

was cancelled. The parties, however, were not able to resolve the case, so the Court lifted the stay and held a scheduling conference on July 28, 2006.

Plaintiff was given a deadline for filing a motion to confirm the appraisal award. Defendants were given a deadline to file a motion for summary judgment to argue the Plaintiff is not entitled to the appraisal award and a motion for the sanction of dismissal. The Plaintiff's motion was filed on August 18, 2006. On October 11, 2006, Defendant filed three motions for summary judgment and a motion to dismiss the action as a sanction. On November 6, 2006, Defendants also filed a motion to strike the affidavits filed by the Plaintiff in support of his responses to the Defendants' motions.

## Plaintiff's Motion to Confirm the Appraisal

On May 1, 2003, the Defendants paid the Plaintiff $20,735.36, for undisputed damages covered by its policy. On May 4, 2006, the parties executed a written agreement regarding the amount of damages resulting from the loss covered under the policy for structure damages due to fire/smoke loss to be $129,212.74 (replacement cost) or $116,943.06 (actual cash value), which includes a reduction for depreciation. They agreed to an additional $24,176.00 as the cost of "pack out-pack back" (moving expenses related to the business' personal property). The appraisers agreed that the award did not account for the prior $20,735.36 payment or deductibles, and the appraisal award should be so reduced to determine the amount due the insured. (Plaintiff's SOF at Ex. 7, Ex. A: Appraiser's Declaration.)

This Court is authorized to confirm the appraisal award. *Morgan v. Carillon Investments, Inc.*, 449 Ariz. Adv. Rep. 31 (April 1, 2005) *en banc* (approving filing a motion to confirm the award pursuant to A.R.S. § 12-1511). The Federal Arbitration Act, 9 U.S.C. § 9 provides for a party to an arbitration award to petition this Court for confirmation of the award, and the Court shall grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. These sections give the Court

limited power to vacate or modify awards, and there is a strong presumption in favor of the validity of arbitration or appraisal awards. *American Almond Products Co., v. Consolidated Pecan Sales Co. I*, 144 F.2d 448 (2nd Cir. 1994).

Arbitrators' conclusions will not be vacated or modified except where an award demonstrates manifest disregard of law or where the award is irrational; the court may not substitute its judgment for that of the arbitrator where neither the award nor record suggests manifest disregard of law. *Diapulse Corp. of American v. Carba, Ltd.*, 626 F.2d 1108 (2nd Cir. 1980); *Stroh Container Co. v. Delphi Industries, Inc.*, 783 F.2d 743 (8th Cir. 1986). Plaintiff asks the Court to enter Judgment in his favor in the amounts set forth in the appraisal award. Once done, all that remains are Plaintiff's claims of bad faith, punitive damages, and attorney fees.

The Defendants respond that this Court may not confirm the appraisal award because it is invalid based on the defenses asserted in Defendants' motions for summary judgment. Alternatively, even if this Court entertains the confirmation further accounting is required to determine the prior payments which have been made to the Plaintiff because the appraisal award called for the deduction of such amounts.

<u>Defendants' Motion for Summary Judgment:</u>
<u>Lack of Standing and Non-Cooperation</u>

Defendants seek dismissal of Plaintiff's case and denial of his claim based on his lack of standing and because he refused to cooperate to establish his identity as the true insured. The record reflects a convoluted chain of title, which Defendants allege raises questions as to whether or not Plaintiff and his wife purchased the Olde Tymers Restaurant as individuals, as the G & G Partnership, or whether he owns it through Olde Tymers Restaurant and Saloon, L.L.C. The allegations that Plaintiff failed to cooperate in establishing his ownership of the insured restaurant are rebutted by the testimony and evidence relied on *by the Defendants*, as follows below.

At his first examination under oath (EUO), "Mr. Gahn testified that he and his wife, Gayle, individually purchased Olde Tymers Restaurant, the business, its personal property, the building, and the real estate from James and Dena King. When confronted with the fact that G & G Partnership may have been the purchaser, Mr. Gahn acknowledged this fact and identified the partnership as consisting of Charlie and Gayle Gahn. He explained that G & G Partnership was not always Charlie and Gayle Gahn, but was originally composed of Mark Gaines and himself. He conceded that Olde Tymers was actually purchased by Gaines and Gahn, but Gaines wanted to withdraw from the partnership, so James and Dena King took the property back in the Fall of 1999. Thereafter, Charlie and Gayle Gahn bought it from the Kings, after having leased the property for about a year, and having exercised an option to purchase in the Fall of 2000. The Gahns now make payments on a note to the Kings monthly." (Motion at 4) (citations omitted).

Asserting that this testimony raised more questions than it answered, Defendants sought further information, which resulted in testimony from Plaintiff that "his business was in the form of an L.L.C., in which he was the only member." *Id.* at 5 (citations omitted). On February 13, 2004, Plaintiff testified that the L.L.C. did not own the restaurant, but that it was owned by either both he and his wife or G & G Partnership, consisting of Charles and Gayle Gahn (a partnership whose existence has never been established)." *Id.* at 6 (citations omitted).

Defendants complain that the Plaintiff's testimony is in conflict with the information it eventually obtained by third party subpoenas and its own investigative efforts, as follows.

The Cochise County Recorder's office reflects that title to the real property, as of June 4, 2004, was held by G & G Partnership. *Id.* at 5. Subpoenas issued in this case and public records confirm that Olde Tymers Restaurant is a limited liability company in good standing, formed September 19, 1998, by the Kings. *Id.* at 6 (citations omitted).

"[A]fter G & G Partnership purchased the real property from the Kings, the Kings repossessed the property due to a default under the note and deed of trust. The Kings, through Olde Tymers Restaurant and Saloon, L.L.C., gave Gahn a full ownership interest in the L.L.C. Gahn agreed to be responsible for, and assume the G & G Partnership note payments to the Kings, as well as for the payment of all insurance on the building and improvements. Thereafter, in spite of the actual transfer of ownership of the L.L.C. to Gahn, and Gahn's assumption of sole liability on the note payable to the Kings, secured by the Deed of Trust on the real property, Gahn leased the property for a year until he exercised his right to purchase it. Thereafter, there were several transfers of ownership interests to the L.L.C., eventually culminating on June 30, 2001, with Gahn's reacquisition of 100% ownership interest in the L.L.C. and liability for 100% of the mortgage payments." *Id.* at 6 (citations omitted).

Defendants submit that it issued the coverage policy to Olde Tymers Restaurant, a partnership, but there is no evidence that such an entity exists. *Id.* at 7. Defendants challenge the partnership entity G & G Partnership because it was dissolved when Mark Gaines withdrew from it. Defendants challenge the entity Olde Tymers Restaurant, L.L.C., because it failed to amend its articles of organization to reflect Plaintiff's acquisition of it. Defendant argues that the Plaintiff Charlie Gahn lacks standing to bring this action as an individual and as an individual, Charlie Gahn, is not a proper party to the proceeding.

Defendants assert that Plaintiff, Charlie Gahn, is a stranger to the insurance contract even though he has undisputably paid all the premiums and undisputably owns in some form or other the insured restaurant. Defendants assert that his failure to meet his affirmative duty to establish the legal form of his ownership is a breach of the cooperation clause of the insurance contract, which has caused prejudice to Defendants because it has been unable to properly evaluate this claim under the contract. Defendants charge that the action must be dismissed because Plaintiff is not a proper party to bring this action.

The Court finds that this is not a jurisdictional matter of standing because Plaintiff owns both the real estate and the business doing business as the Olde Tymers Restaurant and he suffered the losses covered under the policy. Defendants do not allege otherwise in the legal challenges they present here.

Attorneys were not involved in the sales transactions which passed title to the real property and the business from the original owners, Jim and Dena King, to Plaintiff. In large part, the transaction documents were drafted by Plaintiff and Jim King, and the transactions were not recorded. (P's SOF, Ex. 1: 12/19/03 transcript at 37.) In most of these unrecorded transactions, the entity being sold is referred to as the Olde Tymers Restaurant and Saloon, L.L.C. and the buyer/purchaser is identified as Charles Gahn. While the transactions are convoluted, they transferred the ownership interests of the Kings in both the Olde Tymers Restaurant business and real estate to the Plaintiff Gahn. (D's SOF, Ex. 47, 54-65.)

It is undisputed that the insured on the policy is Olde Tymers Restaurant, and the insured property is located at 202 Tombstone Canyon Road, Bisbee, Arizona. Cochise County records reflect that the property is owned by G & G Partnership. Arizona Corporation Commission records reflect that the Olde Tymers Restaurant is a limited liability corporation in good standing. Any technical deficiency in the Complaint may be corrected by adding these two entities as named parties.

The Court notes that the May 1, 2003 payment of $20,735.36 was made by Defendants to Olde Tymers Restaurant and its mortgage holders, who are also named insured under the policy. The mortgage holders signed the proceeds over to the Plaintiff. Defendants do not contend that the mortgage holders or any other individuals or entities claim any entitlement to the insurance proceeds. Defendants have not tendered the appraisal award to the mortgage holders or suggested any other payee. The Defendants have the obligation to pay the appraisal award to the insured and the entity concerns raised here by the Defendants simply do not warrant dismissal of this action because they can be addressed in the final pay

out similarly to the $20,735.36 paid on May 1, 2003, or in several other ways such as adding the corporate entities to the Complaint or executing waivers or releases.

Defendants' Motion for Summary Judgment:
Breach of Cooperation under Examination under Oath Clause

Defendants argue that <u>if</u> the Plaintiff is an insured under the insurance policy, he breached the cooperation clause in the policy because he failed to provide documentary support for his claim. Plaintiff provided three "Sworn Statements in Proof of Loss," which he signed and dated on July 17, 2003. The first was "business income with extra expense" proof in an "undetermined amount." The second was a "building partial" proof for $101,739.41. The third was a "partial business personal property" loss for $24,176. Each proof contained the following: "Insured reserves the right to file additional proofs of loss at a later date." (Motion at 4) (citations omitted).

According to the Defendants, they asked the Plaintiff to bring an updated Proof of Loss with him to his EUO on September 11, 2003. On September 9, 2003, Plaintiff cancelled the EUO, and without providing any of the documentation requested by the Defendants, the Plaintiff concluded that the Defendants were not agreeing to the amount of loss and invoked the appraisal provision of the policy, and asserted the Defendants breached the insurance contract by failing to appoint an appraiser. Plaintiff unilaterally concluded he was relieved of all obligations under the policy including his duty to appear at an EUO. Plaintiff filed the lawsuit on November 28, 2003, seeking specific performance of the appraisal, breach of contract, and breach of the covenant of good faith and fair dealing.

Defendants further allege that when the EUO was taken on December 19, 2003, the Plaintiff failed to produce documentation indicating he was the owner of the premisses and proper party to receive the insurance proceeds, he failed to articulate the basis of his loss, and instead, asserted that his loss was whatever Mr. O'Toole claimed, and failed to explain how the May 1, 2003 payment of $20,735.36 had been spent. The EUO was continued to February 13, 2004, when Plaintiff appeared telephonically. Defendants allege that again the

Plaintiff failed to produce any of the requested documents and provided few additional details regarding loss.

Defendants complain that the Plaintiff referred to James O'Toole as being knowledgeable regarding the claim of loss and Jim King as knowing how the $ 20,735.36 had been spent, yet ignored Defendants' request to conduct EUOs of King and O'Toole.

Defendants allege that Plaintiff produced no documents, even failing to make proper disclosures for purposes of this litigation until this Court's ruling that he disclose all information necessary for the appraisal of the loss, or he would be subject to vacation of the Order of appraisal and the Court would entertain Defendants' Motion for Summary Judgment.

Defendants argue that Plaintiff's refusal to provide information material to his claim at the EUOs amounts to a breach of the cooperation clause of the policy. Any partial compliance will not excuse such a breach of the clause, and the action is subject to dismissal because the breach constitutes a bar to any recovery against the Defendants. (Motion at 8-10) (citations omitted).

The policy "Loss Conditions" include the provision upon which the Court relied when it granted Plaintiff's Motion to Compel the appraisal, which allow either party to make a written demand for an appraisal of the loss, in the event they do not agree on the value of the property or the amount of loss. Additionally, the policy included other pertinent "Loss Conditions," as follows:

The Insured must: 1) notify the police if a law may have been broken; 2) give the insurer prompt notice of the loss or damage, including a description of the property; 3) as soon as possible, give insurer a description of how, when and where the loss or damage occurred; 4) take all reasonable steps to protect the covered property from further damage, to keep the damaged property aside and in the best possible order for examination, and keep a record of your expenses for emergency and temporary repairs; 5) at insurer's request, give

a complete inventory of the damaged and undamaged property, including quantities, costs, values and amount of loss claimed; 6) as often as reasonably required, allow insurer to inspect property involved in loss and examine your books and records; 7) permit insurer to take samples of damaged and undamaged property and permit insurer to copy books and records; 8) within 60 days after insurer requests and provides forms for proof of loss, insured must send insurer signed, sworn proof of loss form containing the requested information; 9) cooperate with insurer in the investigation or settlement of the claim; 10) if insured intends to continue business, he must resume all or part of operations as quickly as possible.  (P's SOF, Ex. 3: Duties in the Event of Loss or Damage and Loss Payment.)

The Insurer retained the right to examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to the insurance claim, including books and records. *Id.*

The Insurer may: 1) pay the value of lost or damaged property; 2) pay the cost of repairing or replacing the lost or damaged property; 3) take all or any part of the property at an agreed or appraised value; or 4) repair, rebuild or replace the property with other property of like kind and quality.  The Insurer must *give notice of its intentions within 30 days after it receives the sworn proof of loss.*  The Insurer shall not pay more than the Insured's financial interest in the covered property and may adjust losses with other owners of lost or damaged property.  *The Insurer shall pay for covered loss or damage within 30 days after receiving the sworn proof of loss, if the Insured has complied with the coverage provisions of the policy **and** the Insurer and Insured have reached an agreement on the amount of loss or an appraisal award has been made.  Id.*

Here, the fire occurred on March 31, 2003.  On April 3, 2003, Defendants' Special Investigating Unit issued an investigative report, questioning the identity of the insured as described in the preceding section of this Order, yet the Defendants paid $20,735.36 to the Plaintiff for the undisputed amount of loss.  After Defendants estimated Plaintiff's loss at

$20,735.36, Plaintiff hired an attorney, William Loftus, and a public adjuster, James F. O'Toole, to represent him and assist him in filing the Proof of Loss statements, which Plaintiff signed under oath and submitted to the Defendants on July 17, 2003. Around this same time, the Plaintiff invoked the appraisal clause of the policy. On November 28, 2003, Plaintiff filed this action to enforce the appraisal provisions of the insurance contract.

The EUOs were held on December 19, 2003, and February 13, 2004. By then the Plaintiff had apparently concluded that the Defendants were not in agreement as to the amount of loss because he had invoked the appraisal provision. This is in keeping with the allegations in his Complaint filed on November 28, 2003, that the Defendants were in breach of the insurance contract's arbitration/appraisal provision because they refused to appoint an appraiser to conduct the requested appraisal.

Defendants' charge that the Plaintiff failed to provide supporting documentation for his Proof of Loss statements is disingenuous.

A review of the transcripts from the two EUOs reveals that the Plaintiff was an atrocious record keeper. For example, on March 11, 2005, he was forced to withdraw his Proof of Loss statement for "business income with extra expenses," which had listed no specific claimed amount because he was unable to provide any documentation regarding his business expenses due to his poor accounting and failure to pay his taxes. (P's SOF, Ex. 9: Wightman letter.)

The review of the transcripts from the two EUOs also reveals that the Plaintiff provided the public adjuster he hired, Mr. O'Toole, with documentary support for his claims of loss, which Mr. O'Toole in turn added to where necessary, prepared the Proof of Loss statements, which Plaintiff reviewed, signed, and submitted to Defendants along with a supporting report from Mr. O'Toole. For example, at the February 13, 2004, EUO, the Defendants asked: "Okay. So as to the direct question what is your damaged stock claim, do I understand you really can't tell me today."  Plaintiff responded: "Right. I will suggest if

you want to know what my damaged stock is, you read what Mr. O'Toole has reported because I gave him all this information as he asked me for it when it was fresh, when I had figures in front of me. And I don't know right now, and you're not going to get me to guess because I won't." (P's SOF, Ex. 2: 2/13/04 transcript at 236.)

Asking about the Proof of Loss on the building claim, Defendants said: "And do I understand you're essentially telling me that you believe this is Mr. O'Toole's claim, and you would stand by that?" Plaintiff responded: "What I'm telling you is, is the claim – it's a proof of claim – proof of loss that I signed after reviewing, and it was submitted to you when you asked for it. It's my proof of loss as it was prepared by Mr. O'Toole, but it was prepared with information that he either got directly from me, or that he determined from his knowledge of what equipment was, you know, that needed replacing and whatnot." *Id.* at 236-37; (see also P' SOF, Ex. 1: 12/19/03 transcript at 134 (explaining that Plaintiff gathered the things both the adjuster and Mr. O'Toole asked for, which were generally the same things, wrote it down and gave it to Mr. O'Toole to put in the report to support the Proof of Loss claims)).

Plaintiff testified that he turned over all his documents to Mr. O'Toole for the Proofs of Loss filed on July 17, 2003, and that he had nothing more to provide at the time of his first EUO. His attorney had sent copies of over 150 documents and photographs possessed by the Plaintiff and Mr. O'Toole, including Mr. O'Toole's entire file, to the Defendants prior to the EUOs. (P's SOF, Ex. 1: 12/19/03 transcript at 38, 44); (P's SOF, Ex. 5: Loftus Affidavit at 4-5).

If any documentation was missing at the time of the EUOs it was documentation of how Plaintiff spent the $20,735.36 he was paid on May 1, 2003. Based on the record before the Court, it appears that the Plaintiff may have failed to provide this information which he said he could get from Jim King, the individual hired to perform most of the emergency repairs paid for with this money. Given the appraisal award has been agreed to by the

11

parties, this information is no longer relevant unless it establishes that the Plaintiff failed to cooperate in providing evidence to support his claim.

Under the policy, the Plaintiff was required to keep a record of his expenses for emergency and temporary repairs, but these expenses did not make up a separate coverage category nor was there any requirement in the policy to make an accounting of how the insurance proceeds were spent. Under the terms of the policy, the Defendants had 30 days from receiving the July 17, 2003 Proofs of Loss to give Plaintiff notice of its intentions regarding his claim or to pay him if they agreed on the amount of loss. Defendants did neither, and the Plaintiff invoked the appraisal provision. Thereafter, Plaintiff appears to have cooperated to the extent necessary for the appraisal of loss because the appraisers were able to agree on the amount of loss and the Appraisal Award on May 4, 2006.

The Court finds that the Plaintiff did not breach the cooperation clause in the insurance contract by relying on Mr. O'Toole's report to support his claim or by invoking the appraisal provision of the insurance contract after Defendants disputed all but $20,735.36.

### Defendants' Motion for Summary Judgment: Bad Faith and Punitive Damages

For the reasons set forth above, the Court denies Defendants' Motion for Summary Judgment on Plaintiff's bad faith claim and Plaintiff's request for punitive damages. There has been little or no discovery in this case, and the Defendants have not disclosed the claim file or the underwriting file.

### Defendants' Renewed Motion for Sanction of Dismissal and Attorney Fees

For reasons set forth above, the Court denies this renewed motion.

**Accordingly,**

**IT IS ORDERED** that the Plaintiff's Motion for Judgment Confirming the Appraisal (document 84) is GRANTED,

**IT IS FURTHER ORDERED** that the Defendants' Motions for Summary Judgment (documents 85, 86 and 87) are DENIED.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Sanctions (document 88) is DENIED.

**IT IS FURTHER ORDERED** Defendants' Motion to Strike the Affidavits of Gahn, Loftus, and O'Toole (document 115) is DENIED.

**IT IS FURTHER ORDERED** that the parties shall have 90 days to complete discovery related to Plaintiff's bad faith and punitive damage claim.

**IT IS FURTHER ORDERED** that dispositive motions related to the remaining claims shall be filed by March 15, 2007. The Pretrial Order shall be due on April 15, 2007. A pretrial conference shall be held, thereafter, at which the Court shall set a trial date.

**IT IS FURTHER ORDERED** that within 20 days of the filing date of this Order, Plaintiff shall file an Amended Complaint to conform with the evidence by adding the following partes as named Plaintiffs: Olde Tymers Restaurant and Saloon, L.L.C. and G & G Partnership.

**IT IS FURTHER ORDERED** that subsequent to filing the Amended Complaint, Plaintiff shall provide a form of Judgment to confirm the appraisal award, reduced by $20,735.36 and the deductible under the policy.

**IT IS FURTHER ORDERED** that in the event the parties wish to attempt to settle the remaining claims, they shall contact this Court's law clerk, Greer Barkley, who shall make the necessary arrangements.

DATED this 21st day of November, 2006.

David C. Bury
United States District Judge